788 A.2d 219

**Matthew Leo GARNER,**

v.

**STATE of Maryland.**

**No. 2590, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Jan. 2, 2002.

Flynn M. Owens (Jack B. Rubin, P.A., on the brief), Baltimore, for appellant.

Celia Anderson Davis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, for appellee.

Argued before MURPHY C.J., and DAVIS and JOHN J. BISHOP, Jr. (Retired, specially assigned), JJ.

MURPHY, Chief Judge.

In the Circuit Court for Baltimore City, a jury convicted Matthew Leo Garner, appellant, of attempted first-degree murder, first-degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence, and unlaw-

ful possession of a handgun. The conflicting evidence present-
ed to the jury was sufficient to establish that he committed
each of those offenses. Appellant argues, however, that he
was unfairly prejudiced by a violation of his Fifth Amendment
rights, and presents a single question for our review:

    I.   Did the prosecutor's misconduct in violating the rule of
        *Doyle v. Ohio* [426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49
        L.Ed.2d 91 (1976) ] so infect appellant's trial with unfair-
        ness as to make the resulting conviction a denial of due
        process?

For the reasons that follow, we shall reverse the judgment
of the circuit court, and remand the case for a new trial.

### Factual Background

In the early morning hours of September 23, 1998, at 4513
Shamrock Avenue in Baltimore City, appellant shot Omar
Ford after Ford punched him.[1] Candace Baxter, who wit-
nessed the shooting, gave testimony that was consistent with
the testimony of Mr. Ford.[2] She also testified that, after the

---

1.  Mr. Ford testified as follows: He had been dating Candace Baxter for
about eight months prior to September 23, 1998, and he telephoned Ms.
Baxter around 1:00 a.m. on that date. When no one answered the
phone, he decided to walk to Baxter's home, knocked on the front door,
but got no answer. At this point, he walked around back, where he
observed Baxter in the company of appellant, whom he had never seen
before. He asked whether they were "messing" with each other.
Appellant replied "yes", while Baxter replied "no." He then punched
appellant in the face, and the two of them began fighting. While he
and appellant were wrestling, he heard a gunshot and saw that appel-
lant had a gun. Ford denied that he was in possession of a gun when
he punched appellant. He then ran into Baxter's house. While fleeing,
he heard another gunshot, and was wounded in his lower back. Upon
entering Baxter's house, he went to a bedroom, where Baxter's mother
told him to lay down while she called an ambulance and the police.

2.  She testified as follows. On September 23, 1998, she resided at 4513
Shamrock Avenue and that Omar Ford was her boyfriend. Shortly
after 2:00 a.m. on that date, she received a phone call from appellant,
and she invited him to her home. When appellant arrived, the two
went to the back of the house and began to "talk." At this point, Omar
Ford showed up and asked appellant if he liked her. When appellant
indicated that he did, Ford punched him in the face. At this point,
Ford and appellant began to wrestle. Appellant then pulled out a gun

shooting, she and appellant became romantically involved, and that appellant told her that he was going to testify that he was not in possession of a gun when Ford punched him. About five days after the shooting, Baxter gave a written statement to appellant's counsel in which she stated that appellant was not in possession of a gun on the occasion at issue. Baxter testified that she gave this statement because she both liked appellant and was scared of him.

Appellant testified to the following facts.[3] He was with Candace Baxter when Mr. Ford confronted the two of them, and asked Baxter "what the fuck was going on." Appellant tried to leave, but Baxter appeared to be afraid and appellant feared for her safety. Ford asked appellant if he liked Baxter, and appellant replied yes. Ford then struck appellant on the left side of his face with enough force to knock appellant to his knees. While he was struggling with Ford, he heard a gunshot and stumbled into a shed in the back yard. The gunshot was fired by Ford. Appellant did not have a gun with him when this incident occurred. After he stumbled into the shed, appellant noticed that the gun was on the ground. Appellant grabbed the gun and, out of fear that Ford was going to harm Baxter, fired one shot in Ford's direction.

The following transpired at this point in appellant's direct examination:

and shot Ford. She was running towards her home when she heard a second shot. Baxter never saw Ford with a gun during the incident.

**3.** According to appellant, Baxter telephoned him early on the morning of September 22, 1998, and asked him to come to her house. Appellant went to Baxter's house, where the two had sex. Appellant then went to work, got off of work between 9 and 9:30 p.m., and went home. Baxter telephoned appellant at approximately 11:00 p.m., after which she came to his house. The two of them went to a friend's house to watch a movie. At about 1:45 a.m., appellant and Baxter left the friend's house, with appellant going to his home, and Baxter going to hers. Upon arriving home, appellant telephoned Baxter, who told him to come quietly back to her house, so as not to wake up her mother. After going back to her house, appellant and Baxter went to the rear of the residence, where they stayed outside, hugging and kissing. At some point, Ford walked up to where they were.

MR. RUBIN: After you fired that weapon what did you do sir?

MR. GARNER: I ran home in fear, I ran home in fear.

MR. RUBIN: What were you afraid of?

MR. GARNER: I was just scared.

MR. RUBIN: What were you scared of?

MR. GARNER: I thought I was shot, I didn't know what was going on.

MR. RUBIN: Were you still bleeding?

MR. GARNER: Yes.

MR. RUBIN: What did you do with the gun as you were running down the alley?

MR. GARNER: When I approached my house I threw it in the alley. Threw it in the backyard of someone's—

MR. RUBIN: The backyard of someone's house?

MR. GARNER: Yes.

MR. RUBIN: And then what did you do, did you go home?

MR. GARNER: Yes.

MR. RUBIN: And what did you do when you got home?

MR. GARNER: I told my mother that I was shot and that I needed to go to the hospital.

MR. RUBIN: You thought that you were shot?

MR. GARNER: Yes.

MR. RUBIN: And were you?

MR. GARNER: No.

MR. RUBIN: Did you go to a hospital?

MR. GARNER: Yes.

MR. RUBIN: You went to the hospital?

MR. GARNER: I went to a hospital a couple of weeks later.

MR. RUBIN: Okay, let me ask you sir, did you stay home?

MR. GARNER: No.

MR. RUBIN: Where did you go?

MR. GARNER: To my brothers [sic] house.

MR. RUBIN: Which brother would that be?

MR. GARNER: My brother Isadore.

MR. RUBIN: And where does he live?

MR. GARNER: On North Avenue.

MR. RUBIN: And what did you do the next day?

MR. GARNER: I came to your office, found out that I had a warrant and went and turned myself in.

MR. RUBIN: Turned yourself in where?

MR. GARNER: Central booking.

MR. RUBIN: The very next day after this incident occurred, correct?

MR. GARNER: Yes.

The following transpired at the conclusion of appellant's cross-examination:

THE STATE: Did you ever tell the police where the gun was?

MR. RUBIN: Objection. I move to approach the bench.

(Counsel approached the bench and the following ensued.)

MR. RUBIN: I move for a mistrial on the basis of Depuis [sic] v. State. She has absolutely no business asking this defendant whether he ever told the police anything ...

\* \* \*

THE STATE: Then I'll withdraw it.

MR. RUBIN: It's too late. It's out of the bag.

THE COURT: (inaudible) tell me why (inaudible)

MR. RUBIN: Your honor she cannot cross examine any defendant about what he did or did not tell the police. Because the defendant in a police setting has an absolute right not to say anything and if he testifies at trial, the State cannot bring up (inaudible) didn't talk to the police.... It's absolutely textbook law.

\* \* \*

THE STATE: I'll withdraw it.

MR. RUBIN: She can't withdraw it, it's out.

THE STATE: He doesn't have to answer it.

MR. RUBIN: No it's not a question (inaudible)

THE COURT: (inaudible)

MR. RUBIN: Your Honor (inaudible)

THE COURT: You made a motion (inaudible)

(Counsel returned to trial tables and the following ensued.)

THE COURT: Objection motion denied. Objection overruled.

THE STATE: Thank you Your Honor. I withdraw the question. May I have a moment Your Honor Please?

THE COURT: Yes.

THE STATE: Thank you. Your Honor I don't have any further questions.

At this point, appellant's counsel renewed his motion and the following transpired:

MR. RUBIN: Your honor I think, I think (inaudible) defendant exercises his right to remain silent which he has every right to do. But the State has no business questioning about that. Even if he elects to testify at trial, the fact that he didn't give a statement to the police is not for the jury to consider. I say that because I don't believe it's curable. If he had given a statement such as "a" testifying as to "b" that's one thing but that was meant for only one purpose.

THE COURT: Excuse me. Answer this question. The question [the prosecutor] asked was "did you tell the police where you threw the gun" and the defendant never answers. Now tell me why.

MR. RUBIN: The defendant didn't answer because I objected. But the point is, the question alone number one suggests that the answer is no. I think that's suggestive by the tone of the question number one. And number two Ms. Driggins knows very well this gentlemen never gave a statement. I mean she has the inherent knowledge knowing whether a defendant gave a statement or not and to put that in the minds of the jury is wrong. Duprey [sic] says it's wrong.

THE STATE: Your Honor I will (inaudible)

MR. RUBIN: Well this jury is going under the impression that he either gave no statement at all or he gave a statement different than his testimony. That was elicited by the prosecutor. It had nothing to do with anything I brought up.... It puts in front of the jury the [sic] that this defendant either exercised a right to remain silent or gave a statement contrary to what his testimony was.

The circuit court denied appellant's motion and the jury ultimately convicted appellant of attempted first-degree murder, first-degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence, and unlawful possession of a handgun.

### Discussion

■ Two of the circuit court's rulings are before us: (1) the refusal to grant appellant's motion for mistrial, and (2) the overruling of appellant's objection to the prosecutor's final question. We need not reach the issue of whether the circuit court abused its discretion in denying the motion for mistrial,[4] because we are persuaded that it erred in overruling the objection to the question, "Did you ever tell the police ... ?"

■ Appellant's trial counsel argued to the circuit court that the question at issue was improper under *Dupree v. State*, 352 Md. 314, 722 A.2d 52 (1998), and has argued to us that this

---

4. Maryland courts "have repeatedly held that the declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice." *Ayers v. State*, 335 Md. 602, 615 n. 2, 645 A.2d 22, 28 (1994), *cert. denied*, 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). "The granting of such a motion, we have said, lies within the discretion of the trial judge who hears the entire case and can weigh the danger of prejudice arising from improper testimony." *Id.* We will not reverse a trial court's denial of a motion for mistrial "unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion." *Hunt v. State*, 321 Md. 387, 422, 583 A.2d 218, 235 (1990)(citing *Johnson v. State*, 303 Md. 487, 516, 495 A.2d 1, 16 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986)).

question was improper under *Doyle v. Ohio, supra.* Those cases, however, involve "post-arrest, post-*Miranda*" silence.[5]

In *Doyle,* the defendants, after being arrested for selling marijuana, received their *Miranda* warnings and chose to remain silent. 426 U.S. at 611–12, 96 S.Ct. at 2242. During their trials, they testified that they had not sold marijuana, but had been "framed." 426 U.S. at 612–13, 96 S.Ct. at 2242. To impeach the defendants, the prosecutors asked them why they had not relayed this version of events at the time of their arrest. *Doyle,* 426 U.S. at 613, 96 S.Ct. at 2243. The United States Supreme Court held that the prosecution may not impeach a defendant with his post-*Miranda* silence because those warnings carry an implicit "assurance that silence will carry no penalty." 426 U.S. at 618, 96 S.Ct. at 2245.

In *Dupree v. State,* 352 Md. 314, 722 A.2d 52 (1998), the Court of Appeals stated that "the prosecution's use for impeachment purposes of a criminal defendant's silence at the time of arrest, after the defendant has been advised of his

---

5. In *Grier v. State,* 351 Md. 241, 258, 718 A.2d 211 (1998), the Court of Appeals emphasized that

[e]vidence of post-arrest silence, after *Miranda* warnings are given, is inadmissible for any purpose, including impeachment. *See Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976); *Miranda v. Arizona,* 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1624 n. 37, 16 L.Ed.2d 694 (1966). As a constitutional matter, allowing such evidence "would be fundamentally unfair and a deprivation of due process." *Doyle,* 426 U.S. at 618, 96 S.Ct. at 2245. As an evidentiary matter, such evidence is also inadmissible. *Younie v. State,* 272 Md. 233, 244, 322 A.2d 211, 217 (1974); *Miller v. State,* 231 Md. 215, 218–19, 189 A.2d 635, 636–37 (1963). When a defendant is silent following *Miranda* warnings, he may be acting merely upon his right to remain silent. *Younie,* 272 Md. at 244, 322 A.2d at 217; *Miller,* 231 Md. at 218–19, 189 A.2d at 636–37. Thus, a defendant's silence at that point carries little or no probative value, and a significant potential for prejudice. *United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975).

*Grier,* 351 Md. at 258, 718 A.2d at 219–20 (1998). "It is fundamentally unfair to induce the defendant's silence by giving *Miranda* warnings, only then to punish the invocation of the constitutional right to remain silent by using that silence to impeach the defendant's testimony at trial." *Dupree,* 352 Md. at 324, 722 A.2d at 57 (citing *Doyle,* 426 U.S. at 618, 96 S.Ct. at 2245).

*Miranda* rights, is a violation of the Fourth Amendment's, U.S. Const. amend. XIV, guarantee of due process." 352 Md. at 324, 722 A.2d at 57 (citing *Doyle v. Ohio, supra,* 426 U.S. at 619, 96 S.Ct. at 2245). The *Dupree* Court held that such evidence is irrelevant, explaining that "[o]nce the State put before the jury the fact that Dupree had been advised of his rights yet offered no evidence of a subsequent statement by Dupree, the inference of Dupree's silence, and thus his guilt, lay dangling for the jury to grab hold." 352 Md. at 333, 722 A.2d at 61. Thus, while proof that the defendant received the *Miranda* warnings is a necessary foundation for the admission of any statement made after the warning, if no statement had been made, the trial court must exclude evidence that the defendant received the warnings. 352 Md. at 332, 722 A.2d at 61.

Although "post-arrest, post-*Miranda*" cases do not control the issue before us, "we have no difficulty discerning the precise nature of the appellant's contention." *Sherman v. State,* 288 Md. 636, 640, 421 A.2d 80, 82 (1980). There is an important distinction between (1) the specific ground of objection (relevancy, unfair prejudice, etc.) and (2) the points and authorities argued in support of the objection. The issue of whether the circuit court erred in overruling a timely objection to the "Did you ever tell the police ... ?" question has been preserved for our review.[6]

In *Wills v. State,* 82 Md.App. 669, 573 A.2d 80 (1990), this Court held that the defendant's post-arrest, pre-*Miranda* silence constitutes improper impeachment:

[E]vidence of an accused's post-arrest, pre-*Miranda* warning, silence for impeachment is inadmissible because the

---

6. It is of no consequence that appellant's counsel did not "move to strike" the improper question and/or request that the circuit court deliver a curative instruction. Error occurred when the circuit court overruled the timely objection to the improper question. Thus, our ruling in this case is in no way inconsistent with the well settled principle that a case should not be reversed on the ground that the trial court failed or refused to make a ruling that it was never asked to make.

probative value, if any, of such evidence, is clearly outweighed by its potential for unfair prejudice. . . .

In view of the potential for unfair prejudice to the defendant and the likelihood that an arrestee's silence is motivated by a reason other than consciousness of guilt, we hold that it is error for the court to admit evidence of a criminal defendant's post-arrest, pre-*Miranda* warning, silence for impeachment purposes.

82 Md.App. at 677–78, 573 A.2d at 84–85.

In *Crosby v. State,* 366 Md. 518, 784 A.2d 1102 (2001), the Court of Appeals noted that

through reliance on State evidentiary law, the Court of Special Appeals has provided greater protection for a defendant's silence than the Supreme Court by asserting that an accused's post-arrest, pre-*Miranda* warning, silence is inadmissible for impeachment because the probative value, if any, of such evidence, is clearly outweighed by its potential for unfair prejudice. *See Grier v. State,* 351 Md. 241, 718 A.2d 211, 220 (1998)(noting that while this Court has not had occasion to address the issue of whether post-arrest, pre-*Miranda* warning, silence is admissible for impeachment purposes, the Court of Special Appeals has reviewed this issue and held that post-arrest, pre-*Miranda* warning silence is too ambiguous to be admissible, even as impeachment evidence)(e.g. *Key–El v. State,* 349 Md. 811, 818, 709 A.2d 1305, 1308 (1998)(explaining that Maryland courts have distinguished between post-arrest and pre-arrest silence); *Wills v. State,* 82 Md.App. 669, 674, 573 A.2d 80, 83 (1990), finding error when evidence of a defendant's post-arrest, pre-*Miranda* silence was admitted for impeachment purposes because the potential for prejudice outweighed the probative value). The Supreme Court concluded that the use of a defendant's post-arrest, pre-*Miranda* silence to impeach did not offend federal due process guarantees; however, the Court commented that states are free to determine, as a matter of state constitutional law or rules of evidence, whether to preclude the admission of this evidence,

*see Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490, 494 (1982), which is precisely the action the Court of Special Appeals determined was appropriate.

*Id.* at 1107, n. 8–11, 784 A.2d 1102. Thus, it is of no consequence that the record is silent as to whether appellant was given *Miranda* warnings after he turned himself in. The circuit court erred in overruling the question at issue.

■ Moreover, when law enforcement officers know that a defendant has retained counsel before turning himself or herself in to face criminal charges, they cannot conduct an interrogation without the presence of that attorney.

As it has been interpreted by the courts, the Sixth Amendment of the United States Constitution prohibits, absent a waiver, the admission of a statement by a criminal defendant when the statement is made (1) outside the presence of legal counsel; (2) in response to interrogation by the State; and (3) after the right to counsel has attached with respect to the charge being tried. *See generally Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Whittlesey v. State,* 340 Md. 30, 665 A.2d 223 (1995), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996).

*Conyers v. State,* 354 Md. 132, 192, 729 A.2d 910, 942 (1999). *See also Bruno v. State,* 93 Md.App. 501, 508, 613 A.2d 440, 444 (1992)(quoting *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985)) (" '[T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.' "); *People v. Bertolo,* 65 N.Y.2d 111, 116, 490 N.Y.S.2d 475, 480 N.E.2d 61, 65 (1985)("where the police know that a suspect is represented by counsel on pending charges, or where the police know that charges are pending but fail to make inquiry which would disclose that counsel has been

assigned or retained, any custodial questioning of the suspect by them in counsel's absence is barred."); *People v. Kaye,* 25 N.Y.2d 139, 143, 303 N.Y.S.2d 41, 250 N.E.2d 329, 331 (1969)(The custodial interrogation of a suspect who is represented by counsel is prohibited in the absence of his attorney, when the police know he is so represented).

In the case at bar, the record shows that appellant had exercised his right to counsel before he turned himself in and that he had no pre-arrest conversations with the police officers. Thus, the police had no right to question him without obtaining an appropriate waiver of his Fifth and Sixth Amendment rights. The record also shows that appellant had not made any statement to a police officer before he turned himself in. Under these circumstances, asking appellant whether he had ever told the police what he had done with the gun clearly exploited his post-arrest silence.[7]

The State argues that, because appellant never answered the improper question, the jury was not presented with any evidence of post-*Miranda* silence. There is no merit in that argument.

> Questions alone can impeach. Apart from their mere wording, through voice inflections and other mannerisms of the examiner-things that can not be discerned from the printed record—they can insinuate; they can suggest; they can accuse; they can create an aura in the courtroom that the trial judge can sense but about which we could not speculate. The most persistent denials, even from articulate adult witnesses, may not suffice to overcome the suspicion they can engender. . . .

*Elmer v. State,* 353 Md. 1, 15, 724 A.2d 625, 632 (1999)(quoting *Craig v. State,* 76 Md.App. 250, 292, 544 A.2d 784, 805 (1988), *rev'd on other grounds,* 316 Md. 551, 560 A.2d 1120 (1989),

---

**7.** The State was entitled to question appellant about his "pre-arrest" silence. The prosecutor, however, did not pursue a line of inquiry that focused upon appellant's pre-arrest opportunities to file a complaint against Mr. Ford.

*jdmt. vacated on other grounds,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)).

In the case at bar, the prosecutor should not have been permitted to ask appellant a question that, whether answered or not, insinuated that he chose to remain silent after he turned himself in to the police. Because the circuit court erred in overruling appellant's objection to that improper question, appellant is entitled to a new trial unless we are persuaded beyond a reasonable doubt that this error was harmless.

> An error is not harmless unless, upon an independent review of the record, a reviewing court is able to declare beyond a reasonable doubt that the error in no way influenced the verdict. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). The prejudice to a defendant resulting from reference to his silence is often substantial. As the Fifth Circuit observed, "we would be naive if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt." *Walker v. United States,* 404 F.2d 900, 903 (5th Cir.1968). Silence at the time of arrest "has a significant potential for unfair prejudice." *United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975).

*Grier,* 351 Md. at 263, 718 A.2d at 222. In light of the conflicting testimony presented to the jury, and the timing of the improper question at issue, we are not persuaded beyond a reasonable doubt that the error was harmless. Appellant is entitled to a new trial.

**JUDGMENTS REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL; COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**